# Richmond

MARGUERITE E. BELL, ET AL. v. ROUTH ROBBINS REAL ESTATE
CORPORATION.

March 7, 1966.

Record No. 6090.

Present, All the Justices.

*L. Lee Bean* (*Bean & Sizemore*, on brief), for the plaintiffs in error.

*Eldridge K. Hayes* (*Clarke, Richard, Moncure & Whitehead*, on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

Marguerite E. Bell and twelve other persons, plaintiffs, all of whom are related by blood or marriage, were the owners of two adjacent parcels of land containing approximately 2.5 acres on Columbia Pike in Fairfax county and appealed from a judgment entered November 30, 1964, whereby they were denied recovery of a real estate commission in the sum of $15,800 which they had paid Routh Robbins Real Estate Corporation, defendant, hereinafter referred to as Robbins Corporation.

Initially, plaintiffs filed a motion for judgment seeking damages in the amount of $100,000 against Donald S. Thorn, Joseph C. O'Brien, Hugh F. Baker, and Robbins Corporation. The motion alleged, *inter alia*, that defendant Robbins Corporation and defendant Baker, its agent and salesman, had breached their fiduciary duty in the sale of plaintiffs' property and that defendants Baker, Thorn and O'Brien had been guilty of fraud with respect to the transaction. The damages sought included the real estate commission paid Robbins Corporation, the profit realized by certain of the other defendants from the resale of a portion of the land claimed to have been fraudulently released from the lien of the deed of trust, and punitive damages.

Baker, who had departed from this State, was not served with process. He filed no pleadings and made no appearance before the court. Hence, this action could not proceed against him. Upon motion of the remaining defendants and without objection of plaintiffs, the court separated for trial the cause of action stated against Robbins Corporation and Baker from that stated against Baker, Thorn, and O'Brien. A trial by jury was waived, and the matter came on to be heard upon plaintiffs' cause of action against Robbins Corporation for a recovery of the real estate commission in the amount of $15,800 which they had paid it for the sale of their property.

The evidence discloses that in September, 1960, Marguerite Bell Cheatham, one of the owners of the two adjacent parcels of land in question, with the consent of the other owners contacted Hugh F. Baker, a salesman for Robbins Corporation, and informed him that the owners wished to sell "the entire piece of property as one transaction." Shortly thereafter plaintiffs executed an exclusive listing agreement with Robbins Corporation dated September 30, 1960, which provided, among other things, that defendant was to have 60 days in which to sell the property; that the sale price was to be $158,000, and that in the event of sale defendant was to receive a commission of $15,800 at the time of settlement. The agreement also bore the signatures "Hugh F. Baker (Agent)" and "Routh Robbins pres. (Realtor)".

About a week later, Baker advised plaintiffs that he had secured a purchaser for the property. He presented to them a "PURCHASE AGREEMENT" dated October 6, 1960, which showed that the land was to be purchased by "D. S. & T. CORPORATION, a Virginia Corporation." The agreement had already been signed by Baker as "Salesman", by Routh Robbins as "Officer" of the Robbins Corporation, and by D. S. Thorn as "President" of D. S. & T. Corporation, the purchaser. It provided, among other things, that the purchase price was $158,000; that cash payment was $45,820; that the balance was to be secured by a first deed of trust, and that "At time of settlement Seller herein agrees to release frontage to a depth of 200 feet on Columbia Pike and width of approximately 200 feet, for building."

Plaintiffs had never sold real estate before, and they questioned Baker about the meaning of the release provision. Baker explained that the provision was "a standard real estate transaction" and that its purpose "was only to release the frontage so that the builders could go ahead and build. It did not mean that we actually would turn the ground loose, that we would give a deed to it—that it was just for the purpose of building so that we could go ahead."

Plaintiffs telephoned their attorney in an attempt to obtain his advice before signing the contract, but the attorney was busy and stated that he would be able to discuss the matter with them the following day. Baker, however, told plaintiffs that he "was in such a rush" to get the contract signed because the purchaser was flying back to New York and that if they "did not go through with the deal that night" they "were going to lose it." Plaintiffs then signed

the contract. The record indicates that they did not see Baker thereafter.

Settlement of the transaction was postponed twice. Plaintiffs were told by an officer of D. S. & T. Corporation that the second delay was caused in part by the fact that contact could not be made with "a woman with race horses" who "had the money" and was "backing" the transaction. Settlement was finally achieved on May 26, 1961. Several months prior thereto Baker's employment with Robbins Corporation had terminated, and he was not present at the closing.

At the settlement Robbins Corporation was represented by its executive vice-president, Leonard C. Whitecar; D. S. & T. Corporation was represented by D. S. Thorn and Joseph C. O'Brien, its president and secretary, respectively, and plaintiffs were present with their attorney. Counsel for plaintiffs had previously learned of the contract provision which released approximately 40,000 square feet of the land's valuable frontage from the lien of the deed of trust. He was concerned about the provision and discussed it with plaintiffs, but it was decided that settlement would be made. D. S. & T. Corporation gave plaintiffs a check for $29,549.55, signed a note for $112,180, and executed a deed of trust on the property, less the released portion, to secure the note. Robbins Corporation received a check for its commission in the amount of $15,800.

About January, 1961, which was after plaintiffs had agreed to sell their land to D. S. & T. Corporation and before settlement, D. S. & T. Corporation contracted to sell the released portion of the land to Excalibar Corporation. The conveyance was later made for a consideration of approximately "$70,000 to $75,000 cash".

D. S. & T. Corporation defaulted in making the first payment of $10,000 on the deed of trust note held by plaintiffs due on May 26, 1962, and the trustees were instructed to institute foreclosure proceedings. At the trustees' sale held on August 13, 1962, plaintiffs purchased the property for $50,000. Thereafter they resold it for $88,036.50 and were required to pay a real estate commission of $5,292.19 on the sale.

Because of the default and foreclosure, plaintiffs requested their attorney to make an investigation of the status of D. S. & T. Corporation and as a result of the investigation this action was instituted. A copy of the "Articles of Incorporation" was filed as an exhibit. It shows that Hugh F. Baker, Joseph C. O'Brien and Donald S.

Thorn executed it as incorporators on January 9, 1961, and that they constituted the initial board of directors. The exhibit also shows that the State Corporation Commission issued the certificate of incorporation on January 18, 1961. Thus, it is evident that the corporation was not in existence on October 6, 1960, when it signed the purchase agreement with plaintiffs. However, it had been chartered by the time the agreement was slightly amended on March 15 and May 17, 1961.

O'Brien, Baker's brother-in-law and a witness for plaintiffs, testified that he was "involved in syndication of real estate". He stated that in the early part of October, 1960, Baker informed him of the listing agreement which he had secured from plaintiffs and inquired if he (O'Brien) could "line up financing" for the purchase of the property. O'Brien said that he then contacted Thorn and that he, Thorn and Baker made "a tentative arrangement" to form the D. S. & T. Corporation, which was before the purchase agreement was entered into on October 6, 1960.

O'Brien was asked by counsel for defendant:

"Q. * * * Mr. O'Brien and let me once again ask a simple question. Do you have any evidence of any kind, written or oral, of Mr. Baker's involvement in the D. S. & T. Corporation other than the articles of incorporation which have been previously introduced in evidence?

"A. I think I have a couple here. Let's see. Here is one."

There was a short interval, and then counsel for plaintiffs said:

"If Your Honor please, this is a little irregular, but I wanted to ask Mr. O'Brien a question because it's relevant to this discussion.

"Do you have a memorandum on yellow paper in Mr. Baker's own handwriting dated October 5, 1960?

"The Witness: I sure do. But they were not in my files."

O'Brien explained that in preparation for the trial he contacted Baker's mother to secure anything he could find pertaining to the corporation. He went to her apartment and located this memorandum. At this point in his testimony the contents of the memorandum, which consisted of 4 sheets of yellow paper, were not disclosed, but later, on re-direct examination, the memorandum itself was admitted in evidence as exhibit No. 12 over the objection of defendant. The papers appeared to be minutes of several meetings of the D. S. & T. Corporation. They were written in longhand and bore the signature "Hugh F. Baker" at the end of each paragraph. They

indicated, among other things, that the first meeting of the "initial incorporators", Thorn, Baker and O'Brien, was held on October 5, 1960, and that the incorporators were elected president, vice-president, and secretary-treasurer, respectively. O'Brien said that the memorandum of this meeting was "similar to the facts". In response to a question by the court he stated that to his knowledge a formal meeting of the incorporators was held for the purpose of electing officers; that Thorn was not present at the meeting but was contacted by telephone, and that the above named officers were elected. He further stated that Thorn paid $7,000 into the corporation but that he and Baker did not "put up" any amount.

According to O'Brien, he and Thorn were the real owners of the corporation but it was understood that Baker was to receive the commission for the "acquisition" of plaintiffs' property as well as a commission for the resale of any portion of it. "[H]e was only to have real estate commission in and out." However, no commissions were ever paid to Baker by D. S. & T. Corporation.

O'Brien further testified that Baker, as a director of the corporation, had a right to vote with respect to corporate affairs and that although no corporate stock had been issued, if a division of stock had been made, it was "possible" that Baker would have received some of it. He stated that he asked Baker twice whether he had disclosed to plaintiffs his interest in D. S. & T. Corporation. The first time he inquired Baker replied "Sure". However, Baker later stated that he had not informed plaintiffs of his interest and said, "No, the Bells do not have knowledge that I am in the corporation." Baker also informed O'Brien that the "officers and management people" of Robbins Corporation had no knowledge of his connection with D. S. & T. Corporation, and the evidence does not disclose that they did.

The plaintiffs did not learn of Baker's connection with D. S. & T. Corporation until sometime after the trustees had sold the property under the terms of the deed of trust, and they did not ratify his actions after gaining such knowledge.

In holding for defendant the trial court included the following findings and conclusions in its final order:

"And the Court having found that Hugh F. Baker, sales agent of Defendant Routh Robbins Real Estate Corporation, was one of the signatories to the articles of incorporation of the buyer corporation, that Baker participated in the initial meeting of the incorpora-

tion of said buyer corporation, that he participated in the election of the buyer corporation's directors, and was elected vice-president thereof, and that Baker may have had some interest in seeing the sale consummated in that the buyer corporation had represented that he would be compensated by subsequent commissions upon resale of the property in question, but that this (when considered in the light of all the evidence presented) does not constitute an interest in the land or an ownership interest in the buyer corporation on the part of the agent, Baker; that he, did not disclose to plaintiff sellers his association with the buyer corporation; that the Defendant Routh Robbins Real Estate Corporation should not be required to forfeit any portion of the full commission of $15,800.00;"

Apparently, the trial court was of opinion that since there was no showing that Baker had any ownership interest in the buyer corporation the broker was entitled to retain the commission. In rendering its decision from the bench, the court concluded by stating, "There is no evidence, as has been stated in different ways two or three times before, that he [Baker] had any ownership in the corporation. And in the absence of any ownership in the corporation, why, of course, there is nothing he could tell them [plaintiffs] about * * *."

The crucial question presented in this appeal is essentially whether the evidence established, as a matter of law, that Baker, defendant's salesman and agent, breached the fiduciary duty which a broker owes to his client, thereby causing a forfeiture of the real estate commission.

In *Ferguson* v. *Gooch*, 94 Va. 1, 26 S.E. 397, 40 L.R.A. 234, we said:

"Nothing is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent, to act for himself and his principal, nor to act for two principals on opposite sides in the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage, and other like features are wholly immaterial. Nothing will

defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Actual injury is not the principle upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution where actual fraud has been committed, or unjust advantage gained, but it is to prevent the agent from putting himself in a position 'in which to be honest must be a strain on him,' and to elevate him 'to a position where he can not be tempted to betray his principal.' 'Under a less stringent rule,' it was said by the court in *Parlin* v. *Woodruff*, [sic, *Porter* v. *Woodruff*], 36 N.J. Eq., 174, 180, 'fraud might be committed, or unfair advantage taken, and yet owing to the imperfections of the best human institutions, the injured party be unable either to discover it or to prove it in such manner as to entitle him to redress. To guard against this uncertainty, all possible temptation is removed, and the prohibition against an agent acting in a dual character is made broad enough to cover all his transactions. * * *'

"* * * To be secretly in the service of the opposite party, while the agent is acting ostensibly for his principal only, is a fraud upon the later and a breach of public morals which the law will not permit. * * *" 94 Va. at pp. 8 and 9. See also, *Schmidt* v. *Wallinger*, 125 Va. 361, 377, 99 S.E. 680; *Duncan* v. *Barbour*, 188 Va. 53, 62, 49 S.E. 2d 260; *Campbell* v. *Sickels*, 197 Va. 298, 302, 89 S.E. 2d 14; *Olson* v. *Brickles*, 203 Va. 447, 450, 451, 124 S.E. 2d 895.

It is likewise well settled that a broker who breaches the fiduciary duty which he owes to his principal forfeits any right to a commission. *Schmidt* v. *Wallinger*, *supra*, 125 Va. at p. 377; *Olson* v. *Brickles*, *supra*, 203 Va. at p. 451; 3 M.J., Brokers, § 34, p. 552.

The evidence clearly supported the court's finding that Baker was a signer of the "Articles of Incorporation" of the buyer corporation; that he participated in the initial meeting of the "incorporation"; that he participated in the election of the directors; that he was elected vice-president of the corporation; that he "may have had some interest in seeing the sale consummated in that the buyer corporation had represented that he would be compensated by subsequent commissions upon resale of the property in question," and that he did not disclose to plaintiffs his connection with the buyer corporation. While the trial court did not specifically find that he was a director of the corporation, the undisputed evidence reveals that he was. These facts were in themselves sufficient to show that Baker had a substantial interest in D. S. & T. Corporation.

Moreover, the evidence further established that Baker's interest in the corporate buyer commenced prior to October 6, 1960, the date the purchase agreement was executed. He, Thorn and O'Brien had made "a tentative arrangement" to form the corporation to purchase plaintiffs' property, and a meeting of the initial incorporators, which Baker attended, had been held.

It was not essential that Baker have an "ownership interest" in the corporation in order to forfeit the commission. Defendant has cited no case, nor have we found one, which stands for the proposition that a broker or its salesman must have such an interest in the corporate buyer before there is a duty to make a disclosure of the interest to the seller-client.

In our view, the evidence conclusively shows that Baker breached his fiduciary duty to plaintiffs in failing to make a full disclosure to them of his interest in, or connection with, D. S. & T. Corporation, the purchaser. Even though defendant's management had no knowledge of Baker's connection with the buyer corporation, defendant was responsible, under familiar agency principles, for Baker's actions while in the scope of his employment, and its right to retain the commission can rise no higher than the right of Baker. Thus, it is evident that plaintiffs are entitled to recover from defendant the full amount of the commission they paid it for the sale of their property.

Defendant has assigned cross-error to the court's action in admitting in evidence plaintiffs' exhibit No. 12, heretofore described. It argues that the "genuineness and authenticity" of the exhibit were not established; that Baker's signature and handwriting were not proved, and that the exhibit "should be stricken from the record in considering this case on its merits."

In overruling defendant's objection to the admission of the exhibit, the trial court made this observation: "I don't think the proper foundation has been laid for the admissibility of this instrument, but I think when you asked the question as to whether or not Mr. O'Brien had any evidence, any tangible evidence, I believe you said, of Mr. Baker's interest in the corporation, I think that that, in effect, did open the door for the introduction of it."

The record shows that during the cross-examination of O'Brien counsel for defendant repeatedly asked whether there was any tangible evidence of Baker's involvement with D. S. & T. Corporation other than his execution of the "Articles of Incorporation".

Counsel's final question was: "Mr. O'Brien and let me once again ask a simple question. Do you have any evidence of any kind, written or oral, of Mr. Baker's involvement in the D. S. & T. Corporation other than the articles of incorporation which have been previously introduced in evidence?" O'Brien replied: "I think I have a couple here. \* \* \*" It was in response to these questions propounded by counsel for defendant that plaintiffs' counsel produced and introduced in evidence exhibit No. 12. As the trial court said, defendant "opened the door" for the introduction of the exhibit. Hence, it was not error to admit it in evidence.

For the reasons stated, the judgment appealed from is reversed and final judgment entered for plaintiffs in the amount of $15,800 with interest thereon from November 30, 1964, the date judgment was rendered for defendant.

*Reversed and final judgment.*